IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

CORINTHIAN MORTGAGE CORP          )
d/b/a SOUTHBANC MORTGAGE,          )
                                  )
        Plaintiff,                )
                                  )
        v.                        )     1:07cv832 (JCC)
                                  )
CHOICEPOINT PRECISION             )
MARKETING, LLC                    )
                                  )
        Defendant.                )

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant's Motion for Summary Judgment.  For the following reasons, the Motion will be granted.

### I. Background

This case arises out of a contractual agreement between Plaintiff Corinthian Mortgage Corporation, doing business in Virginia during the time at issue as SouthBanc Mortgage ("SouthBanc"), and Defendant ChoicePoint Precision Marketing, LLC ("ChoicePoint"), a mailing list broker with its principal place of business in Massachusetts.

On or about January 23, 2002, SouthBanc and ChoicePoint entered into an agreement (the "Service Agreement") wherein ChoicePoint agreed to assist in developing a methodology for creating lists of names and individuals to whom SouthBanc could

1

mail targeted promotional materials.  The parties also entered into a Confidentiality and Nondisclosure Agreement delineating the treatment of information (the "Confidentiality Agreement"), which was incorporated into the Service Agreement.  The Confidentiality Agreement designates as "Confidential Information" all material that "is clearly marked as proprietary, confidential or with other confidentiality notices when disclosed, or . . . is identified as proprietary, confidential or with other confidentiality notices on disclosure."  Def.'s Mem. in Supp. Ex. 2, Confidentiality Agreement at ¶ 1.  Both Agreements contained choice of law provisions indicating that they would be governed by the laws of Massachusetts.  Def.'s Mem. in Supp. Ex. 1 at ¶ 14, Ex. 2 at ¶ 15.  The Service Agreement and Confidentiality Agreement (collectively, the "Agreements") form the written basis of the contractual relationship between the parties dealing with the information at issue in this litigation.

The parties also signed a Confidentiality of Information Agreement (the "COI Agreement") on August 4, 2003, in which both parties agreed "[t]o take all steps reasonably available to them to ensure that . . . nonpublic personal information obtained from the other parties with respect to customers and/or business affairs" would be kept "confidential at all times."  Def.'s Mem. in Opp'n Ex. 3.  The COI Agreement defined confidential information as "any data or information

other that is known to disclosing party, is competitively sensitive, and is not generally known to the public." *Id.* The COI Agreement was amended by SouthBanc, at ChoicePoint's request, to reflect the fact that it dealt with *personal* information and was undertaken to comply with the Gramm-Leach-Bliley Act.

Theresa Ritter ("Ms. Ritter") was a Vice President at SouthBanc and participated in communications regarding the criteria to be used in the SouthBanc name-selection methodology. On or about June 30, 2003, SouthBanc terminated Ms. Ritter. Thereafter, SouthBanc representatives met with ChoicePoint representatives to advise them of concerns that Ms. Ritter was creating a competing company, and, SouthBanc contends, requested that ChoicePoint not allow Ms. Ritter or a new company founded by her to use SouthBanc's criteria for selecting names.

In September 2003, Ms. Ritter formed a competing company in Virginia, Summit Financial LLC ("Summit"). She requested names from ChoicePoint on behalf of Summit in late August 2003, using name selection criteria similar to SouthBanc's. ChoicePoint provided the requested information to Summit and continued to supply names using that criteria through at least January 2005. Before it began working with Summit, ChoicePoint contacted SouthBanc to inform SouthBanc that it would be working with Summit. Def.'s Mem. in Supp. at 8-9; *see also id.* Ex. B at 219-20 (Schmaltz Deposition). There is evidence

that one employee of SouthBanc took actions to block the names of SouthBanc personnel from a Summit mailing list.  By mid-November 2003, SouthBanc knew that Summit was using what it now calls its proprietary name selection criteria, but SouthBanc continued to work with ChoicePoint until June 2004.

On August 17, 2007, SouthBanc brought suit in the Eastern District of Virginia.  It filed an Amended Complaint on November 28, 2007, alleging that ChoicePoint violated the covenant of good faith and fair dealing (Count I), violated Massachusetts' Unfair Trade Practices Act (Count II), and breached the Contract between the parties (Count III).  Defendant filed a Motion to Dismiss on January 11, 2008.  The Court dismissed Count II and denied the Motion as to Counts I and III in a Memorandum Opinion and Order dated February 11, 2008, and affirmed the dismissal of Count II while denying Plaintiff's Motion for Leave to File a Second Amended Complaint on April 4, 2008.

On August 1, 2008, Defendant filed a Motion for Summary Judgment on Plaintiff's two remaining claims: (1) violation of the covenant of good faith and fair dealing, and (2) breach of contract, seeking for each claim monetary damages, costs, and attorneys' fees.  Plaintiff filed an opposition to Defendant's Motion on August 15, 2008, alleging a genuine dispute of material fact as to both claims, and Defendant filed a reply brief on

August 25.  This Motion is currently before the Court.

## II. Standard of Review

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996) (citations omitted).  The party seeking summary judgment has the initial burden of showing the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The party opposing summary judgment may not rest upon mere allegations or denials.  Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (quotation omitted).  A "mere scintilla" of evidence is insufficient to overcome summary judgment.  *Id.* at 248-52.

Unsupported speculation is not enough to withstand a motion for summary judgment.  *See Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411-12 (4th Cir. 1986).  Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  In reviewing the record on summary judgment, "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant."  *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991) (citations omitted).

## III. Analysis

Defendant ChoicePoint seeks summary judgment against Plaintiff SouthBanc on both of SouthBanc's remaining claims for relief, which allege (1) violation of the covenant of good faith and fair dealing, and (2) breach of contract.

A. Confidentiality

The parties disagree about the confidentiality and proprietary nature of the information at issue.  The status of the information – the work orders, pivot tables and other documents that contained name selection criteria exchanged between SouthBanc and ChoicePoint – is central to the case.  If

6

none of the information is confidential, ChoicePoint could not have breached the Agreements between the parties.  The confidentiality of the information in dispute constitutes "an element essential to [SouthBanc's] case."  *Celotex*, 477 U.S. at 322.

ChoicePoint relies on the Confidentiality Agreement incorporated into the Service Agreement, which defines "Confidential Information" as:

> any information or data disclosed by a party . . . under or in contemplation of the Agreement and which (a) if in tangible form . . . is clearly marked as proprietary, confidential or with other such confidentiality notices when disclosed, or (b) if oral or visual, is identified as proprietary, confidential or with other such confidentiality notices on disclosure.

Def.'s Mem. in Supp. Ex. 2 at ¶ 1.  ChoicePoint claims it is undisputed that SouthBanc never marked or identified any work orders or other documents as confidential.  Def.'s Mem. in Supp. at 7.

SouthBanc raises two arguments in response.  First, it claims that it can show a material fact in dispute, because a SouthBanc vice president returned to ChoicePoint a signed Work Order (sent to him by ChoicePoint) containing name selection criteria, preceded by a facsimile cover sheet headed "Fax-Confidential."  *See* Pl.'s Mem. in Opp'n at 5; Ex. 13.  After viewing that facsimile, SouthBanc argues, ChoicePoint should not have questioned whether SouthBanc considered such information to

be confidential and proprietary.

SouthBanc, as the party opposing summary judgment, must set forth more than a "mere scintilla" of evidence in order to show a genuine issue of material fact. *Anderson*, 477 U.S. at 248-52. It has failed to do so here. SouthBanc has not put forth evidence concerning its standard practices on returning work orders (by facsimile or otherwise). The Work Order transferred by facsimile was prepared by ChoicePoint, using attributes requested by SouthBanc. There were no "Confidential" markings setting off the information SouthBanc now claims is confidential in the body of the facsimile. And SouthBanc has not claimed that it marked as confidential any of the underlying communications with ChoicePoint regarding the selection of the attributes contained in the Work Order, even though the express language of the Confidentiality Agreement states that information must be clearly marked as confidential "when disclosed" or "on disclosure." Def.'s Mem. in Supp. Ex. 2 at ¶ 1. It has provided no explanation as to why only one work order was returned under a cover sheet marked "Confidential." While it has claimed that the facsimile transmitted "one of the earliest signed Work Orders," it has not explained why earlier Work Orders were not also marked confidential. Pl.'s Mem. in Opp'n at 5. Most importantly, given the explicit definition in the Confidentiality Agreement, which requires that all confidential information be so marked,

8

SouthBanc has not provided a credible argument as to how a single facsimile cover sheet containing the word "Confidential" in its header could have put ChoicePoint on notice of an ongoing confidentiality claim as to similar documents exchanged in the future.  Even considering the evidence in the light most favorable to SouthBanc, the facsimile cover sheet alone does not create a triable issue of fact as to confidentiality.

Next, SouthBanc argues that various ChoicePoint employees acknowledged that name selection information was confidential or proprietary, as to both the course of dealing between the parties and as a general matter of ChoicePoint policy.  Pl.'s Mem. in Opp'n at 5-6.  Mr. Schmaltz, SouthBanc's Senior Vice President, testified at his deposition that two ChoicePoint employees acknowledged the confidential nature of the name selection methodology and agreed they had an obligation to keep it confidential during phone calls and a meeting around the time of August, 2003.  *See* Pl.'s Mem. in Opp'n Ex. 12 at 193-95, 221-28, 233-34.[1]

ChoicePoint disputes Mr. Schmaltz's recollection of what was said at the meeting, as well as the relevance of Mr. Schmaltz's testimony to the contract and its admissibility.  Choicepoint also contends that, even if admissible, Mr.

---

[1] SouthBanc presented deposition testimony regarding statements allegedly made by ChoicePoint representatives prior to the execution of the Agreements.  Any such statements were merged into the Agreements by express merger clauses.  *See* Def.'s Mem. in Supp. Ex. 1 at ¶ 11; Ex. 2 at ¶ 15.

Schmaltz's testimony is uncorroborated and contradicted by the parties' subsequent conduct.  For the purposes of deciding ChoicePoint's motion for summary judgment, the Court "must draw any inferences in the light most favorable to the non-movant." *Brock v. Entre Computer Ctrs., Inc.*, 933 F.2d 1253, 1259 (4th Cir. 1991).  In deciding this Motion, then, the Court will assume that the meeting took place as Mr. Schmaltz testified.

Earlier, in denying ChoicePoint's motion to dismiss the contract claim, this Court held that it was at least possible that the information exchanged was confidential, because the conduct of the parties "may have modified the requirement that all confidential information be so marked."  Mem. Op. on Def.'s Mot. to Dismiss at 7.  However, SouthBanc now asserts that in relying on the extrinsic actions and statements of ChoicePoint employees, it does not argue that the written agreements were amended or modified.  Instead, SouthBanc now states that it is trying to demonstrate that the parties' performance supports SouthBanc's interpretation of ChoicePoint's contractual obligations.[2]  Mem. in Opp'n at 16.

Massachusetts law governs the question whether SouthBanc can introduce extrinsic evidence on the meaning of confidentiality under the Agreements.  *See* Def.'s Mem. in Supp.

---

[2] SouthBanc may have changed its position on oral amendment or modification to escape the three-year Virginia statute of limitations on oral agreements and oral amendments to written contracts.  *See* Mem. Op. on Def.'s Mot. for J. on the Pleadings at 12.

Ex. 1 at ¶ 14.   In ruling on ChoicePoint's Motion for Judgment on the Pleadings, this Court noted that:

> Under Massachusetts law, "the language of a contract need not be ambiguous on its face in order that extrinsic evidence may be admitted." *Keating v. Stadium Mgmt. Corp.*, 508 N.E.2d 121, 123 ([Mass. App. Ct.] 1987).  Parol evidence may be admitted "[w]hen the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning." *Id.* (quoting *Robert Indus. Inc. v. Spence*, 291 N.E.2d 407, 409 ([Mass.] 1973); *see also Charles River Mortgage Co. v. Baptist Home*, 630 N.E.2d 304, 306 (Mass. App. Ct. 1994).  In this case, since the Agreements are governed by Massachusetts law, extrinsic evidence may be admitted to clarify the parties' understanding of the contractual terms.

Mem. Op. on Def.'s Mot. for J. on the Pleadings at 12-13.  While extrinsic evidence may be admitted to clarify the parties' understanding of the contract's terms, it cannot be used for the purpose of "'contradicting or changing [the contract's] terms.'" *Keating*, 508 N.E.2d at 123 (quoting *Robert Indus., Inc. v. Spence*, 291 N.E.2d 407, 409 (Mass. 1973)).  Under Massachusetts law, the clause a party seeks to explain with extrinsic evidence does not have to be unambiguous on its face.  A court, though, must decide that some ambiguity exists – whether facial ambiguity, ambiguity in application, or the kind of ambiguity that becomes apparent when a contract is "read in the light of the circumstances of its execution," – before looking to extrinsic evidence. *Robert Indus., Inc. v. Spence*, 291 N.E.2d 407, 409 (Mass. 1973).  Even then, that evidence cannot

contradict the terms of the contract.  It can only explain how the parties understood its terms.

The Massachusetts Supreme Court, in a recent decision, summarized its case law on ambiguity and parol evidence by explaining that when contractual language is clear, it must be construed "in its usual and ordinary sense," and that parol evidence cannot be admitted "to create an ambiguity when the plain language is unambiguous."  *General Convention of the New Jerusalem in the U.S. v. MacKenzie*, 874 N.E.2d 1084, 1087 (Mass. 2007).  The Court explained its decision in *Robert Industries* to mean that "extrinsic evidence may be admitted when a contract is ambiguous on its face or as applied to the subject matter," but emphasized that "[t]he initial ambiguity must exist."  *Id*.  The Court continued: "Furthermore, extrinsic evidence cannot be used to contradict or change the written terms, but only to remove or explain the existing uncertainty or ambiguity."  *Id*.

Here, the Agreements are facially unambiguous as to the meaning of confidential information.  The Confidentiality Agreement states that

> Confidential Information means any information or data disclosed . . . under or in contemplation of the Agreement and which (a) if in tangible form or other media that can be converted to readable form, is clearly marked as proprietary, confidential or with other such confidentiality notices when disclosed, or (b) if oral or visual, is identified as proprietary, confidential or with other such confidentiality notices on disclosure.

Def.'s Mem. in Supp. Ex. 1 at ¶ 1.  SouthBanc argues that the
parties' course of conduct makes the confidentiality clause
ambiguous, and that extrinsic evidence shows the parties had a
different understanding of what "confidential information" meant.
In effect, SouthBanc suggests that the contractual term
"Confidential Information means any information . . . clearly
marked proprietary [or] confidential" means something else
entirely, namely that confidential information does not have to
be marked at all.  Such an interpretation directly contradicts
the written confidentiality term in the Agreements.
Massachusetts law forbids such a use of extrinsic evidence.

       At the hearing on the summary judgment motion and in
its papers before the Court, SouthBanc claimed that the COI
Agreement affected the information at the center of this dispute,
creating a broader definition of "confidential."  SouthBanc has
no evidence to support this claim.  The COI Agreement protects
only non-public personal information.  It has no effect on the
issues involved in this case, since the material at issue has
nothing to do with the kind of personal information affected by
the COI Agreement.  The Court finds as a matter of law that the
COI Agreement has no bearing on the dispute at hand.

       SouthBanc has failed to show there is a triable issue
of fact with regard to the confidentiality of the information at
the center of this dispute.  Since SouthBanc cannot prove that

13

ChoicePoint misused confidential information, or indeed that any information exchanged was confidential under the Agreements, its claims against ChoicePoint must fail as a matter of law.

B. <u>Breach of Contract (Count III)</u>

Even if the information at issue was "confidential" under the Agreements, ChoicePoint is still entitled to summary judgment.  Its actions violated neither the Agreements nor good faith and fair dealing under Massachusetts law.  SouthBanc has shown no evidence that ChoicePoint shared Southbanc's information with, or disclosed it to, any other party.  And the Agreements contain no requirement that ChoicePoint prevent any third party from using information that is the same as or similar to information supplied by a another client.  Indeed, the Agreements specifically preserve ChoicePoint's ability to "conduct[] similar discussions or perform[] similar work to that hereunder" for competitors.  Def.'s Mem. in Supp. at 20-21; Ex. 2, ¶ 9.

SouthBanc contends that ChoicePoint breached the terms of the Agreements by "fail[ing] to protect the confidentiality of SouthBanc's proprietary name selection methodology by using it to assist Ritter and her new employer."  Pl.'s Mem. in Opp'n at 14. It asserts that ChoicePoint's failure to protect this information violated the Agreements, which allow ChoicePoint to "use" confidential information only for the purposes for which the disclosing client disclosed that information.  *Id.*; Ex. 1 at ¶ 3

14

(Confidentiality Agreement); Ex. 2 at ¶ 6 (Service Agreement). SouthBanc also cites the "broad protection for confidential information" afforded by the 2003 COI Agreement in support of its breach of contract claim. *Id*. As discussed in Section I above, the COI Agreement has no bearing on the type of information at issue in this case. Nor do the internal confidentiality agreements signed by ChoicePoint employees have any effect on the literal terms of the Agreements between the parties. ChoicePoint is free to set higher or additional standards for its own employees to follow, separate from what it agrees to in contracts with clients.

SouthBanc's arguments that ChoicePoint wrongfully "used" confidential information fall short on factual grounds. It has not shown that ChoicePoint shared, disclosed, or otherwise leaked any confidential information. Instead, SouthBanc seems to be arguing that ChoicePoint violated a contractual duty by not stopping Ritter from using information she obtained during her tenure with SouthBanc. If such a contractual duty exists, ChoicePoint could have violated it by knowingly allowing Ritter to use information she gained while at SouthBanc. Evidence introduced by SouthBanc does show that at least one ChoicePoint employee became aware of possible improprieties on Ritter's part, and that this employee passed her concerns along to her superiors. *See* Pl.'s Mem. in Opp'n at 15; Ex. 5 at 17 (Roth

15

deposition); Ex. 5 at 53-58, 249-50 (Derba deposition).

The operative language in the Agreements comes from
paragraph three of the Confidentiality Agreement: "[t]he
Recipient shall: Use the confidential information only for the
purpose(s) set forth in this agreement."  Pl.'s Mem. in Supp. Ex.
2 at ¶ 3.  It is clear that, taking "use" in its ordinary sense,
ChoicePoint did not breach that express term of its Agreements
with SouthBanc by wrongfully "using" the confidential
information, because ChoicePoint did nothing with the
information.  The breach of contract question turns, then, on
whether ChoicePoint had some additional duty under the Agreements
not to allow Ritter to use confidential information on behalf of
her new company, Summit.  ChoicePoint argues that the Agreements
contain no such requirement, and that ChoicePoint "would never
undertake such a duty because it would require ChoicePoint to
compare customers' name search methodologies – something that
ChoicePoint does not do and is not required to do."  Def.'s Mem.
in Supp. at 21.

SouthBanc argues that the Court should look to the
parties' course of performance as evidence of their views
regarding how they would treat confidential information.  Pl.'s
Mem. in Supp. at 18.  SouthBanc does not contend that the course
of performance, or any extrinsic statements made by ChoicePoint
employees, amend, alter, or modify the Agreements.  It also does

16

not argue that ChoicePoint actually took confidential SouthBanc information and used it on behalf of any other client.  Instead, it asserts that extrinsic evidence shows that the parties had originally contemplated a broad interpretation of ChoicePoint's "use" obligations.

To show that the Agreements did contain a duty on the part of ChoicePoint not to allow Ritter to use any information she obtained from SouthBanc, SouthBanc relies on Mr. Schmaltz's recollection of the disputed August 2003 meeting in Virginia. During that meeting, as Mr. Schmaltz recalled, Mr. Scruton, a ChoicePoint employee, told Mr. Schmaltz that the Agreements required ChoicePoint to protect SouthBanc's information from use by Ritter, and also told Schmaltz that ChoicePoint would not allow Ritter to use SouthBanc's proprietary methodology.  Pl.'s Mem. in Opp'n, Statement of Contested Material Facts at ¶¶ 20-21. ChoicePoint's statements during this meeting, according to SouthBanc, show that ChoicePoint had a contractual duty to stop Ritter from using the information at issue.

Parol evidence may be admitted "[w]hen the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning." *Keating*, 508 N.E.2d at 123. The parol evidence must help clarify some ambiguity in the contract, even if that ambiguity does not appear on the face of the contract. *Id*.  While extrinsic evidence can be used to

clarify ambiguity, it cannot be used for the purpose of "'contradicting or changing [the contract's] terms.'" *Id.* (quoting *Robert Indus., Inc. v. Spence*, 291 N.E.2d 407, 409 (Mass. 1973)).  There must be some ambiguity on the face of the contract or as applied to its subject matter.  *General Convention,* 874 N.E.2d at 1087 (Mass. 2007).  Here, SouthBanc argues that the statements of ChoicePoint employees show that the Agreements contain a duty to stop Ritter from using SouthBanc's information.  SouthBanc points to no ambiguity in the terms of the contract that these statements clarify.  Its preferred construction would change the terms of the Agreements by adding an additional duty.  The Agreements prevent ChoicePoint from "using" confidential SouthBanc information improperly, not from "using and preventing others from using" such information improperly.  In other words, SouthBanc argues that the Agreements contain a term that does not appear on their face.  The Agreements do not create any affirmative duty on the part of ChoicePoint to prevent the use of any information by third parties.  They only refer to ChoicePoint's own use of confidential information.

In short, SouthBanc has not demonstrated that a triable issue of fact exists as to whether ChoicePoint violated the express terms of the Agreements.  It also has not shown that the parties contemplated additional duties on the part of ChoicePoint

under the sections of the Agreements setting limitations on the use of confidential information.  Since the contractual language is clear, there is no need to look to extrinsic evidence or the course of performance of the parties.  No triable issue of fact exists, and the Court will rule as a matter of law that ChoicePoint did not breach any contract it had with SouthBanc.

C. Violation of the Covenant of Good Faith and Fair Dealing (Count I)

Under Massachusetts law, "[a] covenant of good faith and fair dealing is implied in every contract." *Speakman v. Allmerica Fin. Life Ins. & Annuity Co.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005) (citing *UNO Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 805 N.E.2d 957 (Mass. 2004)).  The purpose of the covenant "is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance," and when operating under this covenant, "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract."  *Id.* (citing *Anthony's Pier Four, Inc. v. HBC Associates*, 583 N.E.2d 806 (Mass. 1991); *UNO Restaurants*, 805 N.E.2d 957 (Mass. 2004).

In the determination of whether a breach has occurred, "[t]he essential inquiry is whether the challenged conduct conformed to the parties' reasonable understanding of performance

19

obligations, as reflected in the overall spirit of the bargain,
not whether the defendant abided by the letter of the contract in
the course of performance." *Speakman*, 367 F. Supp. 2d at 132*.*
Good faith performance of the contract, however, does not
contemplate extra-contractual rights.  "[T]he requirement of good
faith performance is . . . circumscribed by the obligations of
the contract . . . [and] the covenant may not be invoked to
create rights and duties not contemplated by the provisions of
the contract or the contractual relationship."  *Id.*

        In rejecting ChoicePoint's Motion to Dismiss the good
faith and fair dealing claim, this Court held that if statements
made during the disputed August 2003 meeting were part of "the
agreement" between the parties, and if ChoicePoint breached that
agreement, then:

> Plaintiff has made a claim that Defendant failed to
> "remain faithful to the intended and agreed
> expectations of the parties in their performance."
> *Speakman*, 367 F. Supp. 2d at 132.  Although the
> agreement regarding Summit was not explicit in the
> parties' written agreements, if it was part of the
> spirit of the bargain then Plaintiff has stated a claim
> for violation of the covenant of good faith and fair
> dealing under Massachusetts law.

Mem. Op. on Def.'s Mot. to Dismiss at 9-10.  The question before
the Court now becomes whether SouthBanc has put forward
sufficient evidence to create a triable issue of fact over
whether the statements made during the August 2003 meeting were
part of the Agreements between the parties such that they

constitute part of ChoicePoint's good faith and fair dealing obligations.  If, however, the ChoicePoint assurances "create rights and duties not contemplated by the provisions of the contract or the contractual relationship," then ChoicePoint is entitled to summary judgment on the good faith and fair dealing claim.  *Speakman*, 367 F. Supp. 2d at 132 (citing *UNO Restaurants*, 441 Mass. at 385-86).

ChoicePoint argues that SouthBanc cannot use the covenant of good faith and fair dealing "to create a new obligation that is not in the Agreements and that would directly conflict with ChoicePoint's contracted-for right to provide services to others on a non-exclusive basis."  Def.'s Mem. in Supp. at 29.  It further claims that ChoicePoint did nothing to deprive SouthBanc of the fruits of its contract, since ChoicePoint provided the requested data and services under the Agreements.  SouthBanc counters by claiming that Ritter's use of the information at issue, aided by the "deceptive complicity" of ChoicePoint, deprived it of the fruits of the contract by suppressing the response rate to its mailings and thereby "watering down" the information provided to SouthBanc.  Pl.'s Mem. in Opp'n at 21.

SouthBanc's good faith and fair dealing claim falters on several grounds.  First, SouthBanc has not put forward sufficient evidence to create a triable issue of fact over

21

whether the promises purportedly made at the August 2003 meeting were part of the Agreements between the parties, or that they created or evidenced rights or duties contemplated by the parties in forming the Agreements.  Again, there is no contention that any promises given in 2003 amended or modified the contracts.  Instead, SouthBanc relies on the Agreements, and states that any promises made in August 2003 show the parties' intent in forming the Agreements.  If the Agreements did not contemplate such a duty to prevent Ritter from using information she gained from SouthBanc, the court cannot imply such a duty under the aegis of "good faith and fair dealing."  Here, the contractual terms show that no such duty was created.  Indeed, ChoicePoint expressly bargained for the right to work with SouthBanc's competitors.

Second, SouthBanc cannot take shelter in the broad "spirit of the bargain" language in *Speakman*.  The *Speakman* court contrasted cases where a party exercises an express contractual power in "a manner that comports with the parties' reasonable expectations as to performance" with cases where one party used a contractual term to exact concessions or deprive the other party of money owed to it.  *Speakman*, 367 Fed. Supp. 2d at 132.  Here, ChoicePoint did not take advantage of the literal contractual terms to undermine the parties' reasonable understanding of their obligations under the Agreements.  Again, ChoicePoint specifically contracted for the right to work with SouthBanc's

competitors.  *See* Def.'s Mem. in Supp. Ex. 1, ¶ 2; Ex. 2, ¶ 9.

        "The duty of good faith and fair dealing concerns the manner of performance."  *UNO Restaurants, Inc.*, 441 Mass. at 385. The Agreements binding the parties are unambiguous with respect to confidentiality and the use of confidential information.  It is clear that ChoicePoint did not breach the express terms of the Agreements, and "good faith and fair dealing" will not suffice to add additional terms to the Agreements.  SouthBanc has not put forward sufficient evidence to create a genuine issue of material fact as to whether ChoicePoint took any action during the performance of its contract with SouthBanc that undermined the parties' reasonable understanding of their obligations under the Agreements.

## IV. Conclusion

        For the foregoing reasons, Defendant's Motion for Summary Judgment will be GRANTED.

        An appropriate Order will issue.


September 11, 2008                    _____/s/_____
Alexandria, Virginia                          James C. Cacheris
                                     UNITED STATES DISTRICT COURT JUDGE