IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| CORINTHIAN MORTGAGE CORP | ) | |
| d/b/a SOUTHBANC MORTGAGE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:07cv832 (JCC) |
| | ) | |
| CHOICEPOINT PRECISION | ) | |
| MARKETING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant's Motion
for Attorneys' Fees.  For the reasons stated below, the Court
will **grant** Defendant's motion.

## I.  Background

This case arises out of a contractual agreement between
Plaintiff Corinthian Mortgage Corporation, doing business in
Virginia during the time at issue as SouthBanc Mortgage
("SouthBanc"), and Defendant ChoicePoint Precision Marketing, LLC
("ChoicePoint"), a mailing list broker with its principal place
of business in Massachusetts.

On or about January 23, 2002, SouthBanc and ChoicePoint
entered into an agreement (the "Service Agreement") wherein
ChoicePoint agreed to assist in developing a methodology for
creating lists of names and individuals to whom SouthBanc could

1

mail targeted promotional materials.  The parties also entered into a Confidentiality and Nondisclosure Agreement (the "Confidentiality Agreement") delineating the treatment of information, which was incorporated into the Service Agreement. The Confidentiality Agreement designates as "Confidential Information" all material that "is clearly marked as proprietary, confidential or with other confidentiality notices when disclosed, or . . . is identified as proprietary, confidential or with other confidentiality notices on disclosure."  Def.'s Summ. J. Mem. in Supp. Ex. 2 ("Confidentiality Agreement"), at ¶ 1. Both Agreements contained choice of law provisions indicating that they would be governed by the laws of Massachusetts.  Def.'s Summ. J. Mem. in Supp. Ex. 1 ("Service Agreement"), at ¶ 14, Confidentiality Agreement at ¶ 15.  The Service Agreement and Confidentiality Agreement (collectively, the "Agreements") form the written basis of the contractual relationship between the parties dealing with the information at issue in this litigation.

Theresa Ritter ("Ms. Ritter") was a Vice President at SouthBanc and participated in communications regarding the criteria to be used in the SouthBanc name-selection methodology. On or about June 30, 2003, SouthBanc terminated Ms. Ritter. Thereafter, SouthBanc representatives met with ChoicePoint representatives to advise them of concerns that Ms. Ritter was creating a competing company, and, SouthBanc contends, requested

that ChoicePoint not allow Ms. Ritter or a new company founded by
her to use SouthBanc's criteria for selecting names.

In September 2003, Ms. Ritter formed a competing
company in Virginia, Summit Financial LLC ("Summit").  Summit
requested names from ChoicePoint in late August 2003, using name
selection criteria similar to SouthBanc's.  ChoicePoint provided
the requested information to Summit and continued to supply names
using that criteria through at least January 2005.  Before it
began working with Summit, ChoicePoint contacted SouthBanc to
inform SouthBanc that it would be working with Summit.  Def.'s
Summ. J. Mem. in Supp. at 8-9; *see also id*. Ex. B at 219-20
(Schmaltz Dep.).  There is evidence that one SouthBanc employee
took actions to block the names of SouthBanc personnel from a
Summit mailing list.  By mid-November 2003, SouthBanc knew that
Summit was using what it calls its proprietary name selection
criteria.  SouthBanc, however, continued to work with ChoicePoint
until June 2004.

On August 17, 2007, SouthBanc brought suit in the
Eastern District of Virginia.  It filed an Amended Complaint on
November 28, 2007, alleging that ChoicePoint violated the
covenant of good faith and fair dealing (Count I), violated
Massachusetts' Unfair Trade Practices Act (Count II), and
breached the Contract between the parties (Count III).  Defendant
filed a Motion to Dismiss on January 11, 2008.  The Court

dismissed Count II and denied the Motion as to Counts I and III in a Memorandum Opinion and Order dated February 11, 2008.  After considering each party's Motion for Reconsideration, the Court affirmed its previous holdings and denied Plaintiff's Motion for Leave to File a Second Amended Complaint.

On August 1, 2008, ChoicePoint filed a Motion for Summary Judgment on SouthBanc's two remaining claims, which the Court granted.  ChoicePoint has now filed a motion for attorneys' fees and costs pursuant to Fed. R. Civ. P. 54(d)(2).  SouthBanc filed its opposition on October 24, 2008, and ChoicePoint submitted a reply brief on November 4.  This Motion is before the Court.

## II. Standard of Review

Federal Rule of Civil Procedure 54(d)(2) provides that a "claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages."  The Rule also sets out timing and content requirements for a motion for attorney's fees.  Fed. R. Civ. P. 54(d)(2)(B).  ChoicePoint has fulfilled all of these requirements.

The party requesting fees bears the burden of demonstrating the reasonableness of what it seeks to recover. *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990); *Cook v. Andrews*, 7 F. Supp. 2d 733, 736 (E.D. Va. 1998).  "The most

useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 174 (4th Cir. 1994).  The product of the reasonable fee and reasonable rate is referred to as the lodestar amount. *See Daly v. Hill*, 790 F.2d 1071, 1076 n.2 (4th Cir. 1986). Attorneys' fee award decisions are within the discretion of the district court.  *See McDonnell v. Miller Oil Co.*, 134 F.3d 638, 640 (1998).

### III. Analysis

SouthBanc's lawsuit against ChoicePoint arose primarily out of the Service Agreement and the Confidentiality Agreement incorporated into it.  SouthBanc claimed that ChoicePoint's actions violated the terms of the Agreements, the covenant of good faith and fair dealing implied in contracts by Massachusetts, and the Massachusetts Unfair Trade Practices Act. The Service Agreement provides that, if litigation between the parties arises out of it, the prevailing party "shall be entitled to an award of its reasonable attorneys' fees and costs." Service Agreement at ¶ 10.  Massachusetts law recognizes awards of attorneys' fees where a contract provides for such an award. *Pearson v. Bd. of Health*, 525 N.E.2d 400, 402 (Mass. 1988). ChoicePoint argues that, since it prevailed on the merits in the

litigation, it is entitled to reasonable attorneys' fees and costs under the Service Agreement.  It seeks attorneys' fees of $887,882.58 and costs and expenses of $162,881.92.

In determining the reasonable hourly rate and reasonable number of hours spent working on the litigation, the Court uses the 12-factor test first set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The *Johnson* factors are:

(1)  The time and labor required . . . .
(2)  The novelty and difficulty of the questions . . . .
(3)  The skill requisite to perform the legal service properly . . . .
(4)  The preclusion of other employment by the attorney due to the acceptance of the case . . . .
(5)  The customary fee . . . .
(6)  Whether the fee is fixed or contingent . . . .
(7)  Time limitations imposed by the client or the circumstances . . . .
(8)  The amount involved and the results obtained . . . .
(9)  The experience, reputation, and ability of the attorneys . . . .
(10) The "undesirability" of the case . . . .
(11) The nature and length of the professional relationship with the client . . . [and]
(12) Awards in similar cases.

488 F.2d at 717-19; *see Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 652 (4th Cir. 2002); *Daly v. Hill*, 790 F.2d 1071, 1078 (4th Cir. 1986).

SouthBanc does not question the reasonableness of ChoicePoint's showing with respect to the *Johnson* factors relating to the novelty and difficulty of the legal questions, the requisite skill and ability to properly perform the legal

service and the attorneys' reputations and abilities; the attorneys' customary fees; or the time limitations in the case. It takes issue only with the reasonableness of ChoicePoint's calculation under the factors related to the time and labor involved, the amount at issue, and the results obtained (factors (1) and (8)).  The Court will address these disputes below, in subpart III.B.

    A. <u>Reasonableness Under the Uncontested *Johnson* Factors</u>

        1. *Factor 2: Novelty and Difficulty of Legal Questions*

        The legal issues in this litigation were somewhat complex.  The case involved three intertwined claims decided under Virginia procedural law and Massachusetts substantive law. Both parties retained expert witnesses and filed well-researched briefs.  The briefs outlined legal questions related to evolving Massachusetts law on contractual obligations with which the Court was not previously familiar.  There were, however, no completely novel legal issues presented, and the Court did not rely on a new or creative interpretation of Massachusetts law in reaching its decision.

        2. *Factors 3 & 9: Requisite Skill; Experience*

        Likewise, the Court agrees that the attorneys representing both parties evinced the skill required to litigate this case effectively.  ChoicePoint retained experienced attorneys familiar with federal court practice.  The lawyers

representing both parties demonstrated a high level of legal
acumen.

       3. *Factor 5: The Customary Fee*

       In determining a reasonable rate, the Court looks to
the customary fee charged by the lawyers.  In addition to its own
attorneys' affidavits, ChoicePoint must also put forward specific
evidence showing that the rates requested are consistent with the
prevailing market rate in the relevant community.  *See Plyler v.
Evatt,* 902 F.2d 273, 277 (4th Cir. 1990).  ChoicePoint's
attorneys provided a declaration establishing that the hourly
rates they charged in this matter were the same or less than the
rates regularly charged by partners, associates and legal
assistants at their firm.  *See* Def.'s Mem. in Supp., Ex. C, Angle
Decl. ("Angle Decl.") at ¶ 6.  Furthermore, ChoicePoint provided
an affidavit from an outside lawyer who testified to the
prevailing market rates in the relevant community (Richmond and
Northern Virginia) for the type of work performed.  *See* Def.'s
Mem. in Supp., Ex. B, Rolfe Decl. ("Rolfe Decl.") at ¶¶ 23-29.
The affidavit claims that the hourly rates sought by
ChoicePoint's attorneys and supporting staff fall within the
prevailing rates in Richmond and Northern Virginia.  Rolfe Decl.
at ¶ 23; *see Trimper v. City of Norfolk*, 58 F.3d 68, 76 (4th Cir.
1995), *cert. denied*, 516 U.S. 997 (1995) ("the proper measure of
fees is the prevailing market rate in the relevant

market . . . .").

The rates charged by the three principal attorneys (two partners and one associate) working on ChoicePoint's defense hovered around the upper quartile of the rates charged by lawyers with comparable experience working at Virginia law firms with over 150 lawyers, as outlined in *The Survey of Law Firm Economics* (Altman Weil 2007).  *See* Rolfe Dec. at ¶ 25(c).  The billing rates for the two principal partners were approximately equal to the Laffey Matrix figures for lawyers with similar experience.[1] The rate charged for the principal associate was above the reasonable rate in the Laffey Matrix.  *See* Rolfe Decl. at ¶ 28. The Court acknowledges that much of the work was performed at a discount from the standard rates used by ChoicePoint's counsel. *See* Angle Decl. at ¶ 13.  The customary rate, however, is only one factor in the determination of an overall reasonable rate.

While the Court does not find the billing rates outrageous for the geographical area and the level of practice, it finds that some reduction will be necessary to set what the Court believes to be a reasonable rate and thus achieve a

---

[1] The Laffey Matrix is used as a guideline for reasonable attorney fees in the Washington / Baltimore area.  *See Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. E. Sign Tech, LLC*, 2006 U.S. Dist. LEXIS 72345 at *7 (E.D. Va., October 4, 2006) (using the *Laffey* matrix as evidence of reasonableness).  The matrix is hosted on the website of the United States Attorney's Office for the District of Columbia.  *See* http://www.usdoj.gov/usao/dc/Divisions/Civil_Division/Laffey_Matrix_7.html. The rates are adjusted for cost of living and are based on rates found reasonable in *Laffey v. Nw. Airlines*, 746 F.2d 4, 24-25 (D.C. Cir. 1985), *overruled in part on other grounds by Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1524 (D.C. Cir. 1988).

reasonable overall fee in this case.  A ten percent across-the-board reduction in the rates charged by ChoicePoint's counsel and legal assistants will bring the requested fees closer to the average rates charged by lawyers at similarly-situated firms in the geographical area and will place all of the rates at or slightly below the guideline rates contained in the Laffey Matrix.  Considering the *Johnson* factors examined above and those discussed below, the Court finds that such a reduction is necessary to achieve an overall reasonable collection of hourly rates for this litigation.

> 4. *Factor 7: Time Limitations*

ChoicePoint's attorneys worked under the time constraints typical in the Eastern District of Virginia.  The document-heavy litigation moved swiftly and efficiently from the filing of the Complaint to the motion for summary judgment. Discovery, which involved over one million pages of documents, lasted just over three months.  ChoicePoint's counsel, however, have extensive experience litigating in this District.  The timing of cases in this District would not have been unexpected.

> 5. *Unaddressed Factors (Factors (4), (6), (10)-(12))*

Neither party made arguments for or against the reasonableness of the fee request based on the other *Johnson* factors – those that look at the preclusion of other employment caused by the acceptance of the representation, whether the fee

was fixed or contingent, the "undesirability" of the case, the nature and length of the relationship between ChoicePoint and its attorneys, and awards in similar cases.

The Court has before it no evidence to suggest that ChoicePoint's attorneys were precluded from taking more remunerative work because of the litigation or that this case was undesirable.[2]  ChoicePoint's attorneys charged fixed hourly fees. Additionally, looking at the eleventh *Johnson* factor, there is nothing out of the ordinary about the nature and length of the relationship between ChoicePoint and its attorneys.

None of these factors bolster ChoicePoint's argument that its fee request is reasonable.  They weigh more heavily, and are more informative, in the context of civil rights litigation, where attorneys often take cases on a pro bono or reduced-fee basis in reliance on the statutory guarantee of "reasonable" attorney's fees to the prevailing party.  *See* 42 U.S.C. § 1988(b).  Here, where the Court does not need to create a reasonable fee out of whole cloth, these factors do not provide a meaningful justification for finding the requested fee either more reasonable or less so.

As for the final factor, fee awards in similar cases, SouthBanc has not suggested that courts have awarded smaller fees

---

[2] ChoicePoint's counsel did apply a discount to the fees it charged ChoicePoint.  Angle Decl. at ¶ 11.  ChoicePoint does not argue that its counsel gave up higher-paying work in order to take this case.

in factually similar cases.  Neither, though, did ChoicePoint
cite any factually similar cases with an equally high fee award.
The Court believes that it would be quite unusual to award
attorneys' fees approaching $900,000 for a case that did not
require a full trial on the merits.  *Cf. Anderson v. Rochester-
Genessee Reg'l Transp. Auth.*, 388 F. Supp. 2d 159, 165 (finding
the amount of hours claimed to be excessive where, among other
factors, the case was resolved before trial).

    B. <u>Contested Factors</u>

       SouthBanc does not contest ChoicePoint's showing on the
*Johnson* reasonableness factors discussed above.  It does,
however, take issue with ChoicePoint's analysis of factors (1)
and (8), regarding the time and labor required and the amount
involved and results obtained in the litigation, respectively.

       1. *Factor 1: Time and Labor Required*

       In support of its claim that its counsel expended a
reasonable amount of time on the litigation, ChoicePoint notes
that the case involved ten substantive motions requiring
research, briefing, and argument.  Def.'s Mem. in Supp. at 6.  In
addition, ChoicePoint's counsel took and defended a number of
depositions, prepared witness lists, exhibit lists, and discovery
designations, and reviewed those prepared by SouthBanc's counsel.
*Id.* at 8.  ChoicePoint also claims to have faced significant
burdens related to discovery, including the necessity of

12

producing more than 1 million pages of documents.  *Id*. at 7.  In
a previously-litigated case closely related to the present
action, SouthBanc prevailed on a spoliation motion.[3]  To avoid
any inadvertent alteration of electronically stored information,
ChoicePoint says, it took extra care during its production, used
an outside vendor, and assembled a team of 8-10 associates that
worked for several weeks to begin producing the documents.
ChoicePoint was simultaneously reviewing documents produced by
SouthBanc, many of which it claims were produced in a
disorganized fashion that hindered its analysis.  *Id*.  In light
of all these circumstances, ChoicePoint contends that the hours
it expended on the litigation were reasonable.

     SouthBanc contests ChoicePoint's claims regarding the
"time and labor required."  It argues that ChoicePoint's total
fee request should be denied because ChoicePoint failed to
apportion the fee between claims, that expert witness fees are
not recoverable as a cost, and that the fees requested for
discovery are excessive.

     a. <u>Apportionment</u>

     SouthBanc suggests that the Court should deny
ChoicePoint's fee request in its entirety.  It argues that the
attorney's fee provision of the Settlement Agreement only allows

---

[3] The case was *Corinthian Mortgage Corp. d/b/a SouthBanc Mortgage v. Summit Financial, LLC, et al.*  It was heard in the Circuit Court of Fairfax County as Chancery No. 187513.

ChoicePoint to recover fees and costs related to Count III of the Complaint, for breach of contract, and that ChoicePoint did not meet its duty to apportion fees and costs between the claim for which it could recover them and those for which it could not. Pl.'s Mem. in Opp'n at 3-4.

In support of this theory, SouthBanc cites *Despiegelaere v. Killion*, 947 P.2d 1039 (Kan. App. 1997).[4]  That case applied the general rule mandating the apportionment of fees and costs between claims for which fees and costs are allowed and those for which they are not allowed when multiple causes of action are brought together in a single case.  *Id.* at 1044.  The *Despiegelaere* court noted, however, that an exception to the apportionment requirement applies when the causes of action brought in a lawsuit depend on the same facts or circumstances and are thus intertwined; the court explained that such related claims must be "intertwined to the point of being inseparable." *Id.* (quotation omitted).  The *Despiegelaere* court required the apportionment of one of the plaintiff's three claims where that claim was not "part of the same core of facts and circumstances which gave rise to" the other causes of action.  *Id.*

---

[4] Massachusetts law governs the Settlement Agreement, and so issues related to recovery based on the Settlement Agreement are governed by Massachusetts law.  Under Virginia's conflicts rules, issues related to recovery are considered substantive law.  *Spring v. United States*, 833 F. Supp. 575, 579 (E.D. Va. 1993).  Questions of substantive law are governed by the law of the place where rights are acquired (*lex loci*).  *Id.* at 578.  The parties here, unable to locate on-point Massachusetts law, cited cases outlining the general rules on apportionment.

Even assuming *Despiegelaere* applies in its entirety, the Court finds that ChoicePoint did not have to apportion its fee request by claim.  All of Plaintiff's causes of action arose from the same core of alleged facts.  Each claim relied on ChoicePoint's dealings with Ritter and its alleged mis-handling of information that SouthBanc claimed was confidential.  The claims all asserted a duty on the part of ChoicePoint not to reveal or allow others to use SouthBanc's methods or confidential information.  Here, where all three claims arose from a common core of facts and one of the claims against ChoicePoint was dismissed under the terms of the Confidentiality Agreement, which was incorporated into the Service Agreement containing the attorneys' fees provision, apportionment would be inappropriate.

The Court's finding is confirmed by reference to other case law stating the general rule.  The Supreme Court, in *Hensley v. Eckerhart*, 461 U.S. 424, 432 (1983), explained that where a plaintiff brings distinctly different claims based on different facts and legal theories, it cannot argue that work performed on an unsuccessful claim was part of its ultimate victory.  Where a claim involves "a common core of facts or . . . related legal theories," however, much of the time expended on the case "will be devoted generally to the litigation as a whole, making it difficult to divide the hours."  *Id*. at 435.  In such a case, a court should not view the lawsuit as a series of discrete and

15

unrelated claims; instead, the court should "focus on the significance of the overall relief obtained . . . in relation to the hours reasonably expended." *Id.* Here, ChoicePoint's overall defense was entirely successful.

In *Moore v. Southtrust Corp.*, the reasoning in *Hensley* was applied to a case where the request for attorney's fees was tied to one of several related claims. 392 F. Supp. 2d 724, 734 (E.D. Va. 2005). The court reasoned that "[b]ecause the plaintiff's claims [were] all based on the same set of facts, the . . . claims are so intertwined as to make it impossible to divide the hours spent working . . . on a claim-by-claim basis." *Id.* The *Moore* court reached substantially the same legal outcome as the court in *Despiegelaere*. Here, unlike in *Despiegelaere*, all three claims against ChoicePoint were sufficiently intertwined and related to a common set of facts. Apportionment was not required, and the failure to apportion does not invalidate ChoicePoint's motion for fees.

b. Expert Witness Fees

SouthBanc claims that the $76,112 sought for payment of ChoicePoint's expert is not a "cost" recoverable under the Settlement Agreement. Paragraph 10 of that agreement allows the prevailing party to recover "an award of its reasonable attorney's fees and costs." SouthBanc argues that the meaning of "costs" in the Settlement Agreement is limited by 28 U.S.C.

16

§§ 1920 and 1821, which, when read in tandem, cap the recoverable
payment to a witness at $40 per day.[5]   In support, SouthBanc
cites *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437,
439 (1987), an employment discrimination case in which the
Supreme Court held that "when a prevailing party seeks
reimbursement for fees paid to its own expert witnesses, a
federal court is bound by the limit of § 1821(b), absent contract
or explicit statutory authority to the contrary."[6]

        SouthBanc's argument on "costs" falls short.   Section
1920 addresses "costs" taxable against the losing party under
Rule 54(d) and various federal statutes.   A prevailing party can
recover such costs regardless of whether they have a contractual
right to recover "costs."   *See Crawford Fitting Co.*, 482 U.S. at
440.[7]   Nothing in the Settlement Agreement, however, suggests

---

[5]   Section 1920 allows a judge to "tax as costs the following: . . . (3)
Fees and disbursements for printing and witnesses . . . (6) Compensation of
court appointed experts, compensation of interpreters, and salaries, fees,
[and] expenses . . . ."   Section 1821 sets the fee paid to a witness for a
day's attendance at a deposition or trial.

[6] SouthBanc cites a more restrictive re-formulation of this holding
appearing at the end of the majority opinion: "absent explicit statutory or
contractual authorization for the taxation of the expenses of a litigant's
witnesses as costs, federal courts are bound by the limitation set out in 28
U.S.C. § 1821 and § 1920."   *Crawford Fitting Co.*, 482 U.S. at 445.   In the
context of *Crawford*, which dealt with statutory authorization for the taxation
of costs, it seems likely that "explicit" was intended to modify "statutory,"
especially given the more precise, earlier formulation of the Court's holding.

[7] Other Supreme Court cases cited by SouthBanc in support of its "costs"
theory are inapposite.   In *West Virginia University Hospitals, Inc. v. Casey*,
499 U.S. 83, 89 (1991), the Court held that attorney's fees and expert fees
were separate expenses under the civil rights attorney's fee shifting statute,
42 U.S.C. § 1988.   In *Arlington Central School District Board of Education v.
Murphy*, 548 U.S. 291, 297-98 (2006), the Court explained that under the

that it intended to limit the meaning of "costs" to its use in § 1920. Indeed, doing so would be illogical, because the Settlement Agreement would then recite an award of "costs" for which the law already provided. Under Massachusetts law, a contract should not be construed so as to render one of its terms meaningless. *Baybank Middlesex v. 1200 Beacon Properties*, Inc., 760 F. Supp. 957, 963 (D. Mass. 1991). Instead, each term must be given its plain and ordinary meaning. *See Rogaris v. Albert*, 730 N.E.2d 869, 871 (Mass. 2000). One of the reasonable "costs" ChoicePoint incurred in defending this litigation was the cost of an expert witness on damages. In fact, both parties to the litigation retained expert witnesses. Recovery of this cost is appropriate under the Settlement Agreement.[8]

---

Individuals with Disabilities Act's attorney's fee provision, the meaning of "costs" was limited by § 1920 and § 1821. The present case, however, involves a contractual allowance for costs, not the more limited statutory provision dealt with in *Arlington Central School District Board*. In that case, the Court did approve language from the Second Circuit's earlier disposition of the case stating that the phrase "costs" is a term of art that excludes expert witness fees. *Id.* at 298. The quotation by the Second Circuit, however, dealt only with "expert fees in civil rights fee shifting *statutes*." *Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ.*, 402 F.3d 332, 336 (2d Cir. 2005) (emphasis added). Again, the present case involves a provision for costs outside the realm of cost-shifting under federal civil rights statutes.

[8] SouthBanc raises a separate argument for the exclusion of expert witness fees from costs based on the presence of different fee-shifting language in a separate section of the Service Agreement, one that deals with the indemnification of ChoicePoint from third-party suits. *See* Pl.'s Mem. in Opp'n at 7. The argument is unavailing. In this situation, the Court finds that the use of two different expense-shifting sentences within the same document does not call for a re-interpretation of "costs" as used in paragraph 10. Each expense-shifting section protects against a different risk; the use of different language in the latter section does not indicate that ChoicePoint intended to limit the reach of the prior section. Notably, SouthBanc did not object to other "costs" claimed by ChoicePoint that also fall outside the limits of § 1920 and could also be called "expenses," such as costs for legal research. *See* Def.'s Reply Mem. at 16.

18

c. <u>Fees and Expenses Relating to Document Production</u>

SouthBanc argues that ChoicePoint has claimed excessive attorneys' fees and expenses relating to document production and document review.  SouthBanc asserts that the 1.2 million pages ChoicePoint claims to have produced and the several million pages it claims to have reviewed overstates the work actually performed, because most of the pages were part of large spreadsheets and reports irrelevant to the case.  Second, SouthBanc counters ChoicePoint's complaints about the state of its own production.  It claims to have produced most documents in searchable native format or with Summation load files that allow electronic searching.  It also states that it did not turn over documents in a "disorganized" fashion, but produced them electronically as they were maintained in the course of business.  Third, SouthBanc claims that the 80,000 pages of printed paper ChoicePoint received, which related to a subpoena for Theresa Ritter's documents from the previous litigation, were also produced electronically.  SouthBanc argues that it should not be penalized for ChoicePoint's decision to copy the paper documents and review them individually.  Pl.'s Mem. in Opp'n at 10-11.

In response, ChoicePoint asserts that, regardless of how large or small individual documents were, it had a duty to review all of them.  It claims to have reviewed more than 2.6 million pages of documents in response to SouthBanc's broad

discovery requests, retrieved documents from more than a dozen custodians, and collected data located on computers in Massachusetts and Georgia.  Def.'s Reply Mem. at 9-11. ChoicePoint outlines numerous problems it had with SouthBanc's production and claims that at least some the documents it received as a result of its subpoena to Ritter were not produced electronically.  *See id.* at 13.

The Court agrees with SouthBanc that the hours spent on production are excessively high and that full compensation for such work would inflate the total fee award to an unreasonable extent.  This document-heavy case imposed substantial discovery burdens on both parties, and the Court acknowledges the time pressures faced by ChoicePoint during the discovery process.  A substantial part of the fee request in this case is related to discovery, however, and the Court is not convinced that discovery in this case was handled in a manner that would allow ChoicePoint to collect the full amount of its requested fees.  ChoicePoint, for example, reviewed approximately 80,000 pages of hard copy material related to the Ritter subpoena that SouthBanc also produced electronically.  In addition, most of the pages produced by ChoicePoint were from documents and spreadsheets more than 100 pages long.  SouthBanc should not be charged for inefficiencies related to production or ChoicePoint's review of its own production.

Unfortunately, the billing statements provided by ChoicePoint do not make clear exactly how much money was spent on discovery.  SouthBanc estimated the total amount as between $160,000 to $200,000.  ChoicePoint did not take issue with this estimate.  The Court finds a reduction in the total fee based on inefficiencies in document production and review appropriate in this case.

2. *Factor 8: Amount Involved and Results Obtained*

In its Complaint, SouthBanc sought $10 million in damages, plus interest, attorneys' fees, and costs.  SouthBanc's expert stated that, with the inclusion of prejudgment interest, SouthBanc suffered damages of nearly $11 million.  Def.'s Mem. in Supp. at 12.  The amount potentially at stake in the litigation, then, was substantial.  ChoicePoint also argues that SouthBanc's claims impugned its business reputation, which made vigorous litigation necessary.  *Id.*

SouthBanc contends that, because the Court ruled unfavorably on several of ChoicePoint's motions, ChoicePoint should not recover costs and fees for those motions. Specifically, SouthBanc disputes the reasonableness of any fee related to ChoicePoint's Motion to Dismiss or Motion for Reconsideration, its Motion to Strike one of SouthBanc's expert witnesses, and its opposition to SouthBanc's Motion for Sanctions based on Spoliation.  SouthBanc claims that ChoicePoint did not

21

prevail on any of these motions in a way that would entitle it to attorney's fees.[9]

ChoicePoint emphasizes its eventual success on all the claims raised against it.  It cites *School Board of York County v. A.L.*, 2007 U.S. Dist. LEXIS 16395, *37-38 (E.D. Va. March 6, 2007), in which the court was not persuaded to "reduce the fee award for reasonable, but unsuccessful tactics within the litigation. . . . [the] inquiry is simply whether the time was reasonably expended."  *Cf. Webb v. Sloan*, 330 F.3d 1158, 1167-68 (9th Cir. 2003) (finding that the district court erred in not awarding attorney fees for three unsuccessful motions because the court did not properly determine whether the motions were "unrelated" to the claims on which the party prevailed).  The Supreme Court's decision in *Hensley v. Eckerhart*, while it does not apply directly to this situation, supports the view that a court's inquiry into what fees are "related" to success on the merits should focus on the end result rather than every incident of litigation leading to it: "[l]itigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what

---

[9] While it acknowledges that ChoicePoint's Motion to Dismiss was successful in dismissing Count II of the Complaint, the Massachusetts Unfair Trade Practices claim, SouthBanc argues that the statutory claim does not provide a basis for attorneys' fees because it does not "arise out of" the Settlement Agreement.

matters." *Hensley*, 461 U.S. at 435.

Thus, while ChoicePoint won only a partial victory on its motion to dismiss, the fees it charged were billed as part of a successful defense to claims arising from the same core of common facts. *See supra* at III.B.1.a. The Court will not find them unreasonable. Nor will it find ChoicePoint's defense against SouthBanc's motion for reconsideration unreasonable, as the Court affirmed its earlier findings in favor of ChoicePoint.

However, the Court will find that a full award related to ChoicePoint's motion for reconsideration, which was rejected by the Court, would be inappropriate. Likewise, the Court will also reduce the total fee to account for excessive billing related to SouthBanc's spoliation motion and its motion to strike SouthBanc's expert witness.[10]

The Court agrees with ChoicePoint that its motion for reconsideration, motion to strike, and defense against SouthBanc's spoliation motion were each – at least tangentially – part of its ultimately successful defense on the merits against claims "related" to the breach of contract claim. Thus, the Court will not find the hours expended on these matters unreasonable because they are "unrelated" to ChoicePoint's

---

[10] SouthBanc has estimated the fee associated with the motion to strike as approximately $6,700 and the fee related to SouthBanc's motion for sanctions as between $33,000 and $37,000. Pl.'s Mem. in Opp'n at 12. SouthBanc also estimated that ChoicePoint spent between $66,000 and $80,000 related to its motion to dismiss and the motions for reconsideration. *Id.* ChoicePoint did not contest these estimates.

ultimate success.  *See Webb*, 330 F.3d at 1167-68.  Rather, the Court believes that ChoicePoint's counsel inefficiently allocated its time to these motions, all of which were either not ruled on or rejected.  The motion to strike, for example, required two court appearances and two rounds of briefing.  Pl.'s Mem. in Opp'n at 12.  None of these efforts contributed substantially to ChoicePoint's ultimately successful defense.  The Court does not suggest, of course, that ChoicePoint's defense should have been any less zealous – but it will not award fees for hours expended unnecessarily or on legal tactics of questionable value.  The Service Agreement provides for the award of "reasonable" attorneys' fees.  The Court finds that a full award for all the hours spent on these motions and defenses would be unreasonable.

C. <u>Costs</u>

Finally, ChoicePoint asserts that under the Service Agreement, SouthBanc is obligated to reimburse the costs ChoicePoint incurred in its successful defense.  Service Agreement at ¶ 10.  ChoicePoint claims to have incurred $86,769.92 in expenses related to copying, delivery, production, court reporters, travel expenses, and legal research costs.  In addition, ChoicePoint paid $76,112 for its damages expert.  It requests an award of all actual costs and expenses, for a total of $162,881.92.

In addition to opposing the expert witness fee,

SouthBanc objects to any costs related to the Ritter production,
for the reasons discussed above.  *See supra* at III.B.1.b.-c.
From the submissions of the parties, it appears that ChoicePoint
spent $22,602.72 on copying and other costs related to the Ritter
production.  *See* Pl.'s Mem. in Opp'n at 10-11; Def.'s Reply Mem.
at 13 n.7.  The Court agrees that these costs, related to the
inefficient handling of the Ritter production, should not be
charged to SouthBanc.

   With the exception of the expert witness fee, discussed
above, SouthBanc did not raise further objections to
ChoicePoint's claimed costs.  The Court finds that ChoicePoint
reasonably incurred the remainder of the costs, which the Court
will award to ChoicePoint as required by the Service Agreement.

 D. <u>The Reasonable Fee</u>

   Considering all of the *Johnson* factors, and reducing
the fee for discovery and document production and for the motion
to reconsider, the motion to strike SouthBanc's expert, and fees
related to SouthBanc's motion for sanctions, the Court finds that
a $165,000 reduction in the requested fee will bring the number
of hours charged down to a reasonable level.  The Court arrived
at this figure partly by using SouthBanc's estimates for the
costs associated with the motion for sanctions, the motion to
strike, and its estimated range of costs associated with
discovery.  The format of the billing statements received by the

Court made more precise measurements difficult.  In any event, given the high number of hours charged and the fact that the case did not require a trial, the Court believes that the reduction is necessary to bring the hours charged for this litigation into the realm of reasonableness.

Discounting the fees charged by ten percent to bring the hourly rates down to an amount the Court believes to be reasonable leads to a total reasonable fee of $641,595.  The Court believes that, although the case did not proceed to trial, the fee is reasonable for this document-heavy litigation handled competently by attorneys at two large and able firms.  The total costs, with the appropriate deductions from the Ritter production, come to $140,279.20.

### IV. Conclusion

For the reasons stated above, the Court will **grant** Defendant's Motion for Attorneys' Fees and award fees of $641,595 and costs of $140,279.20.

An appropriate Order will issue.


January 5, 2008                    _____/s/_____
Alexandria, Virginia                   James C. Cacheris
                               UNITED STATES DISTRICT COURT JUDGE